RECEIVED AND FILED

2007 AUG 30  AM 8: 06

CLERK'S OFFICE
U.S. DISTRICT COURT
SAN JUAN, P.R.

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,
  Plaintiff,

v.                                                          Criminal No. 05-417 (PG)

JORGE A. COLON-SOLIS [37],
  Defendant.

## ORDER

On December 1, 2005, Defendant Jorge Colon-Solis was indicted, along with multiple co-defendants, for conspiracy to possess with the intent to distribute and distribution of narcotics in violation of 21 U.S.C. §§ 846 and 841(a)(1) and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), and 1956(a)(1)(B)(i). The indictment also included drug forfeiture and money laundering forfeiture counts. Pending before the Court is Defendant's Motion for Suppression of Evidence (Dkt. No. 555). The government filed a response in opposition (Dkt. No. 597) and both parties filed subsequent memorandums of law (Dkt. Nos. 858, 929, 985). The defendant has moved to suppress as evidence a box containing $96,852.00 in United States currency, alleged to be drug proceeds, on the grounds that it was unlawfully seized by U.S. Customs agents pursuant to a warrantless search. Before addressing the lawfulness of the search and seizure itself, the Court must first determine whether the defendant has standing to raise such a challenge. An evidentiary hearing was held on August 15, 2007 to aid the Court in making this determination.

## FACTS

On September 29, 2005, Jorge Colon Solis ("Colon") shipped a box containing $96,852.00 in cash concealed inside a comforter and various pillows from New Jersey to Puerto Rico via a commercial courier, the United Parcel Service ("UPS"). The money was all in small denomination bills, including thousands of twenty, ten, five and one dollar bills. Based on his

own account and the photographs submitted as evidence (see Dkt. No. 1069, Joint Exhibits IV - VIII), Colon removed the stuffing of several pillows, replaced it with the cash, and re-stitched the pillow casing. He then sewed the bundles inside a bed comforter and re-packaged the comforter inside its original plastic packaging. This was then sealed inside a cardboard box and dropped off at the UPS shipping center in Elizabeth, New Jersey.

Colon contacted his friend, Marilyn Madera ("Madera"), and arranged to have the package shipped to her home in Penuelas, Puerto Rico. Madera agreed to hold the package for Colon and to call him when the package arrived so he could retrieve it from her home upon his return to Puerto Rico. The shipping invoice states that both the shipper and intended recipient were Marilyn Madera, of 843 Bda Maldonado, Penuelas, Puerto Rico. Defendant Colon signed his own name on the signature line. At the hearing Colon stated that the UPS representative filled out the form based on the information he provided and listed Marilyn Madera as the shipper because Colon was in New Jersey to attend a boxing match at the time and did not have a local address to provide. The defendant testified he did not ship the box to his own home (even though his mother and other family members lived there as well and he testified that someone was always home) because he knew sending the package was risky and he didn't want to involve his own family. Although Colon and Madera had been friends for approximately one year, Colon had never previously shipped any packages or other mailings to her or used her address for deliveries.

The required shipping documents were affixed to the outside of the box and UPS accepted the package for delivery. On September 30, 2005, a U.S. Customs and Boarder Protection Agent stationed at the UPS station in Ponce, Puerto Rico randomly selected the box for search. The government maintains this search was made lawfully in the course of the agent's processing and verification of the Shippers Export Declaration ("SED"). Upon discovery of the concealed money, the box and its contents were seized. The package was held at the UPS station pending notification of Madera.

Madera eventually contacted Colon and informed him that a UPS delivery slip had been left on her door directing her to pick up the package, but that the box had not been left. Colon instructed her to give him the delivery slip when he returned to Puerto Rico and said he would

pick up the package himself. When he went to the UPS station to retrieve the package he was

informed of its seizure and questioned by U.S. Customs agents. The agent conducting the

interview approximated that it took place on October 10, 2005. During said interview, Colon

claimed the contents of the package belonged to him.

## DISCUSSION

Colon argues that the warrantless search and seizure of the box and its contents were

unreasonable, in violation of the Fourth Amendment[1]. He maintains that the border search

exception to the Fourth Amendment is inapplicable to shipments between the continental

United States and Puerto Rico and, because the SED paperwork was clearly affixed to the outside

of the box, the U.S. Customs agent had no reason or authority to open the sealed container under

the auspices of complying with SED regulations. The government counters that the agent's

authority to conduct random searches at the UPS station stemmed from the Department of

Commerce's Census Regulations and/or the Export Administration Regulations. The parties

disagree over the extent to which these regulations are applicable to shipments from the

continental United States to Puerto Rico[2]. If properly raised, the

---

[1] The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] The legality of the search itself turns on whether U.S. Customs agents were statutorily authorized to conduct random, warrantless searches on items imported to Puerto Rico from the continental United States. The government maintains their ability to search such packages is rooted in the regulations mandating the filing of a Shippers Export Declaration ("SED"). They claim U.S. Customs and Boarder Protection ("CBP") agents are authorized to conduct random searches for SED verification and enforcement purposes. The SED is a dual purpose document used by the Census Bureau for statistical reporting purposes only, and by the Bureau of Industry and Security and other government agencies for export control purposes. 15 C.F.R. § 30.4. It is this dual use that creates a novel legal issue not previously addressed in the First Circuit or elsewhere. Though the SED is required under two separate agencies and for completely separate purposes, the same form is used for both. A problem arises in that one agency, the Census Bureau, requires the SED to be filed for shipments from the United States to Puerto Rico while the other agency, the Bureau of Industry and Security, excludes Puerto Rico-bound shipments from the SED requirement. Moreover, the provisions governing the use of SEDs are unique to each agency and at times contradictory. (*See i.e.* 15 C.F.R. § 30.4(a) (designating that the SED provisions of that part apply only to the statistical reporting requirements and not to the export control requirements)). It is drafting such as this that breeds confusion.

Criminal No. 05-417(PG)                    4

The Bureau of the Census, Department of Commerce regulations require a SED to be filed for all commodities shipped to Puerto Rico from the United States. 15 C.F.R. § 30.1(a)(2)(I). The Court notes that an SED is not required for shipments between states, including those from the continental United States to Alaska or Hawaii. Thus, under the Census Bureau's regulatory scheme Puerto Rico is treated as distinct from the 50 states (although it is classified as a "nonforeign area" within the statute). The Census Bureau uses the SED for statistical reporting purposes only. 15 C.F.R. § 30.4. Pursuant to the statute, U.S. Customs and Boarder Protection ("CBP") and the Census Bureau have the authority to require the production of documents for the purposes of "verifying the completeness and accuracy of the information reported." 15 C.F.R. § 30.11. Exporters or exporting carriers may be required to produce such documents either at the time of exportation or within a period of three years subsequent thereto. *Id.*

The defendant concedes that CBP had the authority to require production of the documents. However, since the paperwork was clearly affixed to the outside of the box (*see* Joint Exhibit VIII), Defendant argues there was no reason for the CBP agent to open the box. A review of the statute governing the Census Bureau's use of SED reports does indeed lack a provision for inspection of packages. *See* Code of Federal Regulations, Title 15–Commerce and Foreign Trade, Chapter 1–Bureau of the Census, Department of Commerce generally. Under a strict interpretation of the statute, while Customs agents are permitted to collect statistical information relating to exports they are not explicitly authorized to independently verify that the information on the SED is accurate.

A SED is also required to be filed under the provisions of the Export Administration Regulations ("EAR") of the Bureau of Industry and Security, Department of Commerce. 15 C.F.R. § 758.1(a). The Bureau of Industry and Security EAR uses the SED for export control, including to monitor and prevent illegal exports. "The export control provisions of the EAR are intended to serve the national security, foreign policy, nonproliferation, and short supply interests of the United States and, in some cases, to carry out its international obligations. Some controls are designed to restrict access to dual use items by countries or persons that might apply such items to uses inimical to U.S. interests. These include controls designed to stem the proliferation of weapons of mass destruction and controls designed to limit the military and terrorism support capability of certain countries." 15 C.F.R. § 730.6. Thus EAR provisions are geared specifically to national security issues and reach beyond mere reporting obligations.

Under the EAR, CBP is specifically authorized to inspect packages to ensure compliance with export regulations, including the accuracy of the information reported on the SED. 15 C.F.R. §§ 758.7(a) & (b)(1). However, for Bureau of Industry and Security purposes, Puerto Rico is not a foreign destination and the SED requirement and inspection allowances do not apply to such exports. An "export" is an actual shipment or transmission of items subject to the EAR out of the United States. 15 C.F.R. § 734.2(b)(1). However, the export or reexport of items subject to the EAR does not include shipments among any of the states of the United States, the Commonwealth of Puerto Rico, or the Commonwealth of the Northern Mariana Islands or any territory, dependency, or possession of the United States. 15 C.F.R. § 734.2(b)(8). Accordingly, shipments to Puerto Rico are not subject to the EAR and a SED is not required for them under the Bureau of Industry and Security.

The different scopes of the SED's use is further highlighted in each agency's penalty provisions. Violations of SED regulations under the Census Bureau arm of the statute (other than those relating to the export of rough diamonds) provides for a fine of not more than $1,000.00 for each violation. 15 C.F.R. § 30.95(b). The penalty for violations under the Bureau of Industry and Security EAR, however, is seizure and detention of the goods. 15 C.F.R. § 758.7(b)(6).

Thus Puerto Rico shipments fall into the unique category of requiring a SED for statistical reporting purposes where there is no explicit right to search packages but not requiring a SED for

export control purposes, where the right to search packages attaches. This directly affects Fourth Amendment rights generally and a defendant's expectation of privacy specifically. While one typically has a legitimate expectation of privacy in letters or packages shipped through the postal system or private carrier, *United States v. Jacobsen*, 466 U.S. 109, 114 (1984), the requirement of the SED calls into question this notion. First, allowing CBP agents to search Puerto Rico shipments under the auspices of verifying SED information statutorily eliminates this right to privacy in one's mailings to the Commonwealth if a SED is required for all shipments. Secondly, shippers to or from Puerto Rico are theoretically on notice that their package may be inspected, thus eliminating any expectation of privacy, and by extension, the right to Fourth Amendment standing, regardless of whether the search itself would be otherwise justifiable.

The effect of this would seemingly conflict with the well-established principle that shipments to and from Puerto Rico are not subject to inspection under the border exception to the Fourth Amendment. "Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country. This Court has long recognized Congress' power to police entrants at the border." *United States v. Montoya De Hernandez*, 473 U.S. 531, 537 (U.S. 1985) (internal citations omitted). Such an exception delineates a difference in the treatment of domestic transport and shipping with that done internationally. The constitutional requirements of the Fourth Amendment apply to the Commonwealth. *Torres v. Puerto Rico*, 442 U.S. 465, 471 (U.S. 1979). As such, the Supreme Court has declined to recognize an "intermediate border" between Puerto Rico and the United States which would allow for searches akin to those permissible at the international border of the United States. Thus when applying the border exception to search and seizure law, shippers to and from Puerto Rico are afforded the same rights as individuals shipping packages between states. *Id.* at 472.

This reflects Congress' and the Supreme Court's desire to afford Puerto Rico travelers and shippers the same protections as those within the United States, including the right to be free from warrantless search. Permitting random searches without probable cause to Puerto Rico-bound shipments under the guise of SED verification runs contrary to this principle. Furthermore, EAR provisions, which otherwise permit random searches, anticipate and give clear direction excluding shipments between the United States and Puerto Rico. This, too, supports the underlying principles of border search law. If the courts now recognize a new exception to the Fourth Amendment by allowing for the warrantless search of any package accompanied by a SED, regardless of which agency the SED is being used for, the effect would be to negate caselaw and EAR standards providing against just that. The courts would effectively re-open the issue of searches that the Supreme Court and Congress have already provided guidance on.

An additional issue is raised by the presence of the following disclaimer on the shipping invoice: "These commodities, technology, or software were exported from the United States in accordance with the Export Administration Regulations." (Joint Exhibit I). For shipments to foreign countries this statement effectively puts shippers on notice of the governing regulations, including the possibility of searches. However, in the limited category of shipments to Puerto Rico, this disclaimer would seemingly bind shippers to EAR provisions that Congress did not intend to apply. The Court need not decide whether this effectively puts shippers to Puerto Rico on notice that their package is subject to search despite the dual agencies' different purposes, thus allowing for warrantless searches, or if UPS and other commercial carriers are prevented from conferring on CBP agents the right to search in violation of an individual's Fourth Amendment rights, contrary to Congress' intent.

In light of the Court's ruling on Defendant's lack of standing to properly raise these issues, this conflict and the issues it raises regarding one's expectation of privacy need not be resolved in the

aforementioned arguments would be meritorious. However, for the following reasons, Colon has failed to prove he has standing to assert a Fourth Amendment interest. Thus the Court need not reach the issue of the lawfulness of the search.

      The Fourth Amendment grants protection against unlawful searches and seizures of, among other things, a person's effects. It is a cornerstone of Fourth Amendment law that evidence obtained in violation of a defendant's Fourth Amendment rights may not be used against him. *Weeks v. United States*, 232 U.S. 383, 391-92 (1914). However, the Supreme Court has also made clear that a court may not suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court. *United States v. Payner*, 447 U.S. 727, 735 (1980). A court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights. *Id.* at 731. "The interest in deterring illegal searches does not justify the exclusion of tainted evidence at the instance of a party who was not the victim of the challenged practices." *Id.* at 735. The defendant's rights are violated only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party. *Id.* at 731 (citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). Thus in order to cross the standing threshold, a defendant must establish his own legitimate expectation of privacy in the place to be searched or the thing to be seized. Moreover, the expectation of privacy must be one recognized by society as reasonable. *United States v. Jacobsen*, 466 U.S. 109, 123 n. 22 (1984) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). The First Circuit has articulated a number of factors to be considered in making such a determination. They include: ownership, possession and/or control, historical use of the property searched or the thing seized, ability to regulate access, the totality of the surrounding circumstances, the existence or nonexistence of a subjective anticipation of privacy, and the objective reasonableness of such an expectancy under the facts of a given case. *United States v. Aguirre*, 839 F.2d 854, 856-57 (1st Cir. 1988).

---

instant Opinion. Nevertheless, the Court wishes to draw attention to the contradiction among SED uses and to urge clarification and/or reconciliation of SED procedure henceforth.

In the instant matter Defendant sealed his property inside a cardboard box and delivered it to a UPS shipping facility. He designated a friend, Marilyn Madera, as both the sender and the recipient of the box. The Court acknowledges that "letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy." *Jacobsen,* 466 U.S. at 114. This expectation of privacy extends to both senders and addressees of packages. *United States v. Goldsmith*, 432 F. Supp. 2d 161, 170 (D. Mass. 2006) (citing *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992)). Conversely, a defendant who is neither the sender nor the addressee of a package has no privacy interest in it and accordingly cannot assert a Fourth Amendment objection to its search. *See United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988). The defendant attempts to overcome this obstacle by arguing that (1) he was the actual sender despite designating Madera as such on the shipping invoice and (2) that he was the intended recipient of the money contained in the package despite it being addressed and sent to Madera.     It is generally accepted that individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names. *See Goldsmith* at 172; *Villarreal* at 774. However, such was not the case here. Marilyn Madera was not an alter-ego of Colon, but was an actual third person. Even if Colon was the intended recipient of the box, this does not confer a legitimate expectation of privacy because it was addressed to and intended to be received by another individual. *See United States v. Givens*, 733 F.2d 339, 341-42 (4th Cir. 1984); *United States v. Pierce*, 959 F.2d 1297, 1303 (5th Cir. 1992). Similarly, Colon did not use a fictitious alias in place of his own name when indicating the sender either. There, too, he designated an actual third party as the shipper[3]. By designating Marilyn Madera as both the sender and recipient to UPS, Colon effectively transferred his interest in the box to Madera.

Though Colon did not have an interest in the box at the time it was seized, there is some support for his ownership of the money contained inside. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have

---

[3] Colon continually attempted to disassociate himself from the package. He addressed and shipped the box to Madera instead of to his own home because he did not want to put himself or his family at risk. Though Colon claims he did not use his own information because he did not have a local address, he nevertheless lists another foreign address (Madera's address in Puerto Rico) as the sender's. Additionally, nothing prevented him from using his own name as the designated shipper yet he chose not to do so.

been violated, property rights are neither the beginning nor the end of this Court's inquiry." *United States v. Salvucci*, 448 U.S. 83, 91 (1980). Colon testified the money belonged to him, he placed it in the box for shipping, and that Madera was only holding it for him until he could return to Puerto Rico to retrieve it. Through this arrangement, the defendant did not relinquish his ownership interest in the money. The defendant also maintained a possessory interest in the contents of the package. "Possession includes both actual and constructive possession. A person who has direct physical control of something on or around his/her person is then in actual possession of it. A person who is not in actual possession, but who has both the power and the intention to exercise control over something is in constructive possession of it." *Goldsmith*, 432 F. Supp. 2d at 173 (*citing* First Circuit Pattern Jury Instruction 4.22). Given the totality of the circumstances, it appears Colon had constructive possession over the money concealed within the package. However, neither this ownership interest nor this possessory interest extended to the shipping container itself–namely the box and the comforter and pillows which were used to package the bills.

The Court finds guidance from *United States v. Givens,* 733 F.2d 339 (4th Cir. 1980), which presented nearly identical factual circumstances to the case at bar. In *Givens*, the defendants challenged a search and seizure of a mailing envelope which was discovered to contain cocaine hidden inside a cassette tape. The Fourth Circuit found that even if the defendants had a possessory interest in the cocaine, their interest did not broaden to include the mailing envelope or the cassette tape when the package was addressed to an actual third party. *Id.* at 342. In likening the situation to *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978), the appellate court reasoned that "in all these circumstances the owner of the container controls the use of and access to the area as a depository for the property of others". *Givens* at 342. By addressing the package to a third person, the defendants in Givens (as well as Colon) effectively relinquished control over the area in which the contraband they claim an interest in was secreted. Thus while Colon's possessory interest in the money may continue, he forfeited any ownership or possessory interest in its container.

"The right to exclude others affords a significant indicator of whether one has a legitimate expectation of privacy in an area. *Rakas*, 439 U.S. at 144 n. 12. By expressly transferring his

Criminal No. 05-417(PG)                              9

interest in the box to Madera on the shipping invoice and then sending the package to her at her home, Colon ceased to be able to control the use of and access by others to the box. Upon receipt, Madera, as the addressee, could have opened the box at her discretion. Thus Colon's status as the intended recipient of the money could not confer upon him a legitimate expectation of privacy in a package addressed to another. "The government may simultaneously maintain that a defendant criminally possessed the seized good, but was not subject to a Fourth Amendment deprivation, without legal contradiction." *United States v. Salvucci*, 448 U.S. 83, 90 (1980). Colon does not have standing to challenge the U.S. Custom's agent's right to open the box. Furthermore, once opened, the money came into plain view. It is well settled that a defendant cannot claim an expectation of privacy in effects found in plain view, regardless of his ownership interest in the contraband. *United States v. Rawlings*, 448 U.S. 98, 106 (1980). Lacking an expectation of privacy in the box, the search and seizure of the package cannot be properly challenged by the defendant.

**CONCLUSION**

WHEREFORE, Defendant's Motion for Suppression of Evidence is hereby **denied**.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, August 27, 2007.

JUAN M. PÉREZ-GIMÉNEZ
Senior United States District Judge
